IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| JOSEPH CARDIFF, DANIEL W. CHO, MAGDALYNE HILLIARD, and SAYED ABUBAKER, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br>v.<br><br>DOMINION DENTAL USA, INC., DOMINION DENTAL SERVICES USA, INC., DOMINION DENTAL SERVICES, INC., DOMINION NATIONAL INSURANCE COMPANY, DOMINION DENTAL SERVICES OF NEW JERSEY, INC, AVALON INSURANCE COMPANY, CAPITAL ADVANTAGE INSURANCE, and CAPITAL BLUECROSS,<br><br>     Defendants. | Civil Action No.<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Joseph Cardiff, Daniel W. Cho, Magdalyne Hilliard and Sayed Abubaker, individually and on behalf of all persons similarly situated, bring this Class Action Complaint against Defendants Dominion Dental USA, Inc, Dominion Dental Services USA, Inc., Dominion Dental Services, Inc., Dominion National Insurance Company, and Dominion Dental Services of New Jersey, Inc. (together, "Dominion National"), Avalon Insurance Company ("Avalon"), Capital Advantage Insurance Company ("Capital Advantage"), and Capital BlueCross (collectively, "Defendants"), based upon personal knowledge with respect to themselves, and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

## **INTRODUCTION**

1.      Dominion National is an insurer and administrator of dental and vision benefits based in the Mid-Atlantic region. On June 21, 2019, Dominion National announced that it was subject to a massive data breach whereby the sensitive personal, financial, and medical information of nearly three million health plan members was accessed as part of an ongoing, nine-year long data breach (the "Data Breach").

2.      Beginning in August 2010 and continuing through April 2019, hackers exploited glaring vulnerabilities in Dominion National's databases to access the personal, financial, and medical information of current and former members of Dominion National and Avalon vision plans, as well as current and former members of plans Dominion National provides administrative services for, including Capital BlueCross. The stolen information includes names, addresses, email addresses, dates of birth, Social Security numbers, taxpayer identification numbers, member ID numbers, group numbers, subscriber numbers, and/or other protected health information ("PHI") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and for members who enrolled online through Dominion National's website, bank account and routing numbers (collectively "Personal Information").

3.      The Data Breach was discovered after Dominion National received an "internal alert" and retained cyber-security firm FireEye Mandiant to conduct an investigation. In a statement, Dominion National disclosed that, "On April 24, 2019, through our investigation of an internal alert, with the assistance of a leading cyber security firm, we determined that an unauthorized party may have accessed some of our computer servers. The unauthorized access may have occurred as early as August 25, 2010. After learning of this, we moved quickly to

clean the affected servers and implement enhanced monitoring and alerting software. We also contacted the FBI and will continue to work with them during their investigation."[1]

4.      Dominion National is responsible for allowing the breach to occur by failing to implement and maintain reasonable safeguards and failing to comply with industry-standard data security practices, contrary to the representations made in Dominion National's privacy statements and express and implied agreements with plan members.

5.      During the nine-year data breach period, one of the longest undiscovered breach periods ever, Dominion National failed to secure its databases containing massive amounts of members' Personal Information, failed to detect the hackers' presence, and failed to take any steps to investigate the numerous other red flags that should have warned the company that its systems were not secure. As a result of Defendants' failure to protect the information they were entrusted to safeguard, Plaintiffs and Class Members did not receive the benefits of their bargains, and have been exposed to or are at a significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future.

## PARTIES

6.      Plaintiff Sayed Abubaker is a resident and citizen of Washington, D.C., whose Personal Information was compromised in the Data Breach.

7.      Plaintiff Joseph Cardiff is a resident and citizen of New Kensington, Pennsylvania, whose Personal Information was compromised in the Data Breach.

8.      Plaintiff Daniel Cho is a resident and citizen of Johns Creek, Georgia, whose Personal Information was compromised in the Data Breach.

---

[1] Dominion National, Notice of Data Security Incident, https://dominionnationalfacts.com/ (last visited Aug. 9, 2019).

9.     Plaintiff Magdalyne Hilliard is a resident and citizen of Mechanicsburg, Pennsylvania, whose Personal Information was compromised in the Data Breach.

10.    Defendant Dominion Dental USA, Inc., is an insurance company that issues dental plans with its principal place of business in Arlington, Virginia. All of the Dominion National defendants are wholly-owned subsidiaries of Capital Advantage Insurance Company, which is a wholly-owned subsidiary of Capital BlueCross.[2]

11.    Defendant Dominion Dental Services USA, Inc., is a licensed administrator of dental and vision benefits with its principal place of business in Arlington, Virginia.

12.    Defendant Dominion Dental Services, Inc., is an insurance company that issues and underwrites dental plans with its principal place of business in Arlington, Virginia.

13.    Defendant Dominion National Insurance Company, is an insurance company that underwrites dental and vision plans with its principal place of business in Arlington, Virginia.

14.    Defendant Dominion Dental Services of New Jersey is an insurance company with its principal place of business in Arlington, Virginia.

15.    Defendant Avalon Insurance Company is an insurance company that underwrites vision plans with its principal place of business in Harrisburg, Pennsylvania. Dominion National's vision plans are underwritten by Avalon and administered by Dominion Dental Services USA, Inc. Avalon is a wholly-owned subsidiary of Capital Advantage Insurance Company, which is a wholly-owned subsidiary of Capital BlueCross.[3]

16.    Defendant Capital Advantage Insurance Company is an insurance company with its principal place of business in Harrisburg, Pennsylvania. Avalon Insurance Company is a

---

[2] Examination Report of Dominion Dental Services, Inc. (December 31, 2016), https://www.scc.virginia.gov/boi/cons/fin/finex/95657.pdf.

[3] Report of Examination of Avalon Insurance Company (December 31, 2016), https://bit.ly/2TcuuQp.

wholly-owned subsidiary of Capital Advantage, and Capital Advantage is a wholly-owned subsidiary of Capital BlueCross.

17.     Defendant Capital BlueCross is a health insurance company with its principal place of business in Harrisburg, Pennsylvania. Capital BlueCross owns Avalon and the Dominion defendants through its wholly-owned subsidiary Capital Advantage Insurance Company. Dominion National provides dental insurance and administers dental benefits on behalf of members of Capital BlueCross.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000.00 exclusive of interest and costs, there are more than 100 putative Class Members, and minimal diversity exists because many putative Class Members are citizens of a different state than Defendants. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

19.     This Court has personal jurisdiction over Dominion National because it is headquartered in and maintains its principal place of business in this District. Dominion National is authorized to and regularly conducts business in Virginia. Dominion National makes decisions regarding corporate governance and management, including decisions regarding the security measures to protect its customers' Personal Information within this District. Dominion National intentionally avails itself of this jurisdiction by promoting, selling and marketing its services from Virginia to consumers across the country.

20.     This Court has personal jurisdiction over Avalon because it regularly conducts business in Virginia and has sufficient minimum contacts in Virginia such that Avalon

intentionally avails itself of this Court's jurisdiction by conducting operations here and promoting, selling and marketing its services to consumers within this District.

21.     This Court has personal jurisdiction over Capital Advantage because it regularly conducts business in Virginia and has sufficient minimum contacts in Virginia such that Avalon intentionally avails itself of this Court's jurisdiction by conducting operations here and promoting, selling and marketing its services to consumers within this District.

22.     This Court has personal jurisdiction over Capital BlueCross because it regularly conducts business in Virginia and has sufficient minimum contacts in Virginia such that Capital BlueCross intentionally avails itself of this Court's jurisdiction by conducting operations here and promoting, selling and marketing its services to consumers within this District.

23.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Dominion National's headquarters and principal place of business are located in this District, and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District, including, without limitation, decisions made by Dominion National's governance and management personnel that led to the Data Breach. Moreover, Defendants Capital BlueCross, Capital Advantage, and Avalon conduct business in this District, and market and provide services to consumers within this District.

## FACTUAL ALLEGATIONS

### A.  Defendants Knew They Were Targets of Cyber-Threats

24.     Dominion National is dental insurer and administrator of dental and vision benefits in the Mid-Atlantic region based in Arlington, Virginia. Incorporated in 1996, Dominion National describes itself as "an agile and innovative provider and administrator of dental and

vision benefits" that "serves over 875,000 members, including leading health plans, employer groups, municipalities, associations and individuals among its diverse client base."[4]

25.     Dominion National's dental and vision plans are underwritten by Dominion National Insurance Company for members in Georgia and New Jersey, and its vision plans are underwritten by Avalon Insurance Company for members in the District of Columbia, Delaware, Maryland, Pennsylvania, and Virginia. Dominion National also provides dental insurance and administers dental benefits on behalf of members of BlueCross Dental, a dental plan offered by Capital BlueCross based in Harrisburg, Pennsylvania.

26.     As part of its business operations, Dominion National collects significant amounts of individuals' sensitive personal, financial, and medical information. As such, Dominion National acknowledges that it has a duty and obligation to securely store such information and maintains a number of privacy practices and policies governing its responsibilities for doing so.

27.     For example, Dominion National maintains a Code of Conduct that applies to its employees, officers, committee members, and directors. Under the heading "Commitment to Protection of Employee and Member Information," the Code of Conduct states: "At Dominion, we are committed to protecting confidential information, including employee and member information. Dominion restricts access to confidential employee-related information only to those employees and vendor/service providers who need the data to provide services to our employee population. Reasonable caution is taken to maintain physical, electronic, and procedural safeguards to protect this personal data. The safeguards are reviewed periodically by both independent and internal auditors."[5]

---

[4] DominionNational.com, News, https://www.dominionnational.com/news/2017-02-28.

[5] Dominion National, 2019 Code of Business Conduct, at 6, https://dominionnational.com/sites/default/files/Misc/2019%20Dominion%20Code%20of%20Conduct.pdf (last visited Aug. 9, 2019).

28.    The Code of Conduct also acknowledges the significant amount of sensitive information the company collects and its "obligation to diligently protect the privacy and the security of that information":

> Dominion sends, receives, uses, and maintains large volumes of Member information. Our Members trust us with some of their most sensitive information. It is our obligation to diligently protect the privacy and the security of that information. Most Member information is considered PHI [Protected Health Information], whether used alone or in connection with other medical or dental information such as diagnosis, procedure codes, and medical or dental records, and includes, but is not limited to:
>
> • Name.
>
> • Address.
>
> • Social security number.
>
> • Date of birth.
>
> • Date of service.
>
> • Contract number.
>
> As employees of Dominion, we are each responsible for ensuring that PHI is safeguarded, not only in the Company's computer systems and filing cabinets, but in every way that we use and share it. This includes verbal conversations in the hallway or on the telephone, information printed out, and information sent back and forth by email, fax, regular mail, etc. Questions about any privacy issue related to Member information should be directed to the Privacy Office.[6]

29.    Avalon[7] and Capital BlueCross[8] maintain substantially-similar Codes of Conduct that make identical representations concerning data security.

---

[6] *Id*. at 11, 12.

[7] Avalon, 2019 Code of Business Conduct, https://www.avaloninsurance.com/wps/wcm/connect/prod_nws.avaloninsurance.com-2585/8e7ea40d-8ad0-485a-99b3-9976358edd72/av-code-of-conduct.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_4G00HA41L0J4D0A12EPVOS1000-8e7ea40d-8ad0-485a-99b3-9976358edd72-mLtdiiC (last visited Aug. 9, 2019).

[8] Capital BlueCross, 2019 Code of Business Conduct, https://www.capbluecross.com/wps/wcm/connect/prod_nws.capblue.com29556/8f7d0ad0-f2a5-4611-a719-5928742a7d15/cbc-code-of-conduct.pdf?MOD=AJPERES&CVID=mMFBjZy (last visited Aug. 9, 2019).

30.     Dominion National also maintains a "Notice of Privacy Practices" for its plan members. It provides: "One of our primary goals is to safeguard your PHI [Protected Health Information]. We have policies and procedures in place throughout our organization to protect your information. These policies and procedures include: training all employees on appropriate uses, disclosures, and protection of PHI; limiting employee system access to only the PHI needed to perform job duties; ensuring secure disposal of confidential information; using unique user IDs and passwords, etc. This protection covers oral, written, and electronic forms of PHI. In addition, Dominion policy restricts us from sharing your information with employers who sponsor group."[9] Dominion further states that it is "legally required to follow the privacy practices" described in the notice.[10]

31.     Likewise, Avalon[11] and Capital BlueCross[12] maintain a substantially-similar "Notice of Privacy Practices" for their plan members, and Avalon and Dominion National maintain a substantially-similar joint policy for members who enroll in both plans.[13]

32.     Dominion National further maintains a "Notice Concerning Financial Information," which states its commitment to protecting dental plan members' financial information. It states in pertinent part: "An important part of our commitment is our pledge to

[9] Dominion National, Notice of Privacy Practices at 1, https://dominionnational.com/files/Privacy_Policy_Forms/DN_Privacy%20Notice.pdf (last visited Aug. 9, 2019).

[10] *Id*.

[11] Avalon, Notice of Privacy Practices, https://dominionnational.com/files/Privacy_Policy_Forms/Avalon_Privacy.pdf (last visited Aug. 9, 2019).

[12] Capital BlueCross, Notice of Privacy Practices, https://www.capbluecross.com/wps/wcm/connect/prod_nws.capblue.com29556/5f95004f-6dd9-491e-97fa-fc7deeea0c05/notice-of-privacy-practices.pdf?MOD=AJPERES&CVID=mh1I-L. (last visited Aug. 9, 2019).

[13] Dominion National and Avalon, Notice of Privacy Practices, https://dominionnational.com/files/Privacy_Policy_Forms/DN_Avalon_Privacy%20Notice.pdf (last visited Aug. 9, 2019).

protect your personal financial information. … We do not disclose your personal financial information, except as permitted by law. We do not disclose this information, even when our customer relationships end, except as permitted by law. … Our policies restrict access of your information to employees who need this information to provide our products and services to you and as permitted by law. We maintain physical, electronic, and procedural safeguards that comply with legal requirements to protect your personal financial information."[14]

33.     Again, Avalon maintains a substantially-similar policy for vision plan members,[15] and Avalon and Dominion National maintain a joint policy for members who enroll in both plans.[16]

34.     Additionally, Dominion National maintains a "Computer Use and Information Security Policy" which "assists Dominion in providing a business aligned security program that meets its operational, compliance, and information security needs to protect the confidentiality, integrity, and availability of information, data, and the supporting systems."[17] This policy provides that: "Information prepared, generated, received, and/or maintained in written or electronic form by Dominion with the expectation of Dominion and/or another party (e.g.,

---

[14] Dominion National, Notice Concerning Financial Information at 1, https://dominionnational.com/files/Privacy_Policy_Forms/DN_GLB.pdf (last visited Aug. 9, 2019).

[15] Avalon, Notice Concerning Financial Information, https://dominionnational.com/files/Privacy_Policy_Forms/Avalon_GLB.pdf (last visited Aug. 9, 2019).

[16] Dominion National and Avalon, Notice Concerning Financial Information, https://dominionnational.com/files/Privacy_Policy_Forms/DN_Avalon_GLB.pdf (last visited Aug. 9, 2019).

[17] Dominion National, Computer Use and Information Security Policy at 1, https://dominionnational.com/files/Privacy_Policy_Forms/IT-110%20Computer%20Use%20and%20Information%20Security%20Policy.pdf (last visited Aug. 9, 2019).

member, provider, or employee) that the information will be kept private and will not be disclosed to unauthorized parties."[18]

35.     Dominion National's Computer Use and Information Security Policy maintains guidelines for, among other things:

a. ***Limiting Information Access***: "Access to computing facilities, and the information residing on computing facilities, must be limited to the level of access that is needed by an individual to perform his or her job functions."[19]

b. ***Maintaining Computer Security***: "All individuals are … responsible for protecting computer resources from unauthorized access."[20]

c. ***Device and Media Control***: "PHI and other sensitive information must be removed from electronic media and/or devices when the asset or media is no longer needed and/or when the media will no longer be under corporate control."[21]

d. ***Virus and Malicious Software Protection***: "All computing devices must utilize anti-virus and malware software where appropriate. The software must: [i] Be enabled at all times[;] [ii] Scan for viruses and malware on a regular basis, in accordance with corporate guidelines[;] [iii] Have pattern files updated in accordance with corporate guidelines[;] [iv] Have on-access scanning enabled to ensure that any external files are scanned before being introduced into corporate computers."[22]

e. ***E-mail and the Internet***: "PHI and other sensitive information must not be sent outside the company unless it has been secured and is being sent to an authorized individual ... Information that is attached to e-mail must be scanned for viruses before being introduced into, or before leaving, the corporate computing environment. ... Access to the Internet must pass through a controlled corporately recognized environment."[23]

f.  ***Remote Access***: "The only approved method of remotely accessing the corporate computing environment is through the use of the standard corporate solutions. Dominion's IT Strategy, for use by the IT Department, contains additional

---

[18] *Id.*

[19] *Id.* at 3.

[20] *Id.* at 6.

[21] *Id.*

[22] *Id.* at 6-7.

[23] *Id.* at 7.

information about remote access. The establishment of and or use of unauthorized remote access methods or technologies are expressly prohibited."[24]

g. **Security Awareness**: "All existing members of the workforce are required to pass a Security Awareness training program, be aware of security policies, and understand the reasons why policies and procedures are in place. Workforce members must stay informed about their ongoing responsibilities, especially those related to securing PHI and other sensitive information."[25]

36.     The Computer Use and Information Security Policy also references an internal "Dominion Information Security Strategy" that is maintained for Dominion National's Information Technology ("IT") Department and is not publicly-available.

37.     As reflected in these policies, Defendants were at all times fully aware of their obligation to protect members' Personal Information and the risks associated with failing to do so. Indeed, Defendants observed frequent public announcements of data breaches affecting insurance and other health-related industries and knew that information of the type collected, maintained, and stored by Dominion National is highly coveted and a frequent target of hackers.

38.     For example, in August 2014, after a cyber-attack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[26]

39.     In early 2015, Anthem, Inc., the second-largest health insurer in the United States, suffered a massive data breach exposing the names, addresses, Social Security Numbers, dates of

---

[24] *Id.*

[25] *Id.*

[26] J. Finkle, *FBI warns healthcare firms that they are targeted by hackers*, REUTERS (Aug. 20, 2014), http://www.reuters.com/article/2014/08/20/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U20140820 (last visited Aug. 9, 2019).

birth, and employment histories of nearly 80 million current and former plan members nationwide.[27]

40.     In March 2015, health insurer Premera Blue Cross announced it suffered a data breach that exposed the medical data and financial information of 11 million customers, including claims data, clinical information, banking account numbers, Social Security Numbers, birth dates and other data in an attack that began in May 2014.[28]

41.     Shortly thereafter, New York-based insurer Excellus BlueCross BlueShield announced a breach that exposed the personal information of 10 million of its plan members in an attack dating back to 2013, including names, dates of birth, Social Security numbers, mailing addresses, telephone numbers, member identification numbers, financial account information and claim information.[29]

42.     In fact, in its 2019 Data Breach Investigations Report, Verizon noted that there were 927 breaches affecting the insurance and financial industries in 2018 alone, with confirmed data disclosure in 207 of the breaches.[30] The report found that 71% of breaches are "financially motivated" meaning the hackers accessed information with the intention to profit from it.

43.     According to a report by the HIPAA Journal, "healthcare data breach statistics clearly show there has been an upward trend in data breaches over the past 9 years, with 2018

---

[27] C. Riley, *Insurance Giant Anthem Hit by Massive Data Breach*, CNN (Feb. 6, 2015), https://money.cnn.com/2015/02/04/technology/anthem-insurance-hack-data-security/ (last visited Aug. 9, 2019).

[28] *Premera Blue Cross Says Data Breach Exposed Medical Data*, THE NEW YORK TIMES (March 17, 2015), https://www.nytimes.com/2015/03/18/business/premera-blue-cross-says-data-breach-exposed-medical-data.html (last visited Aug. 9, 2019).

[29] *Cyber Breach Hits 10 Million Excellus Healthcare Customers*, USA TODAY (Sept. 10, 2015), https://www.usatoday.com/story/tech/2015/09/10/cyber-breach-hackers-excellus-blue-cross-blue-shield/72018150/ (last visited Aug. 9, 2019).

[30] Verizon, *2019 Data Breach Investigations Report*, available with subscription at: https://enterprise.verizon.com/resources/reports/2019-data-breach-investigations-report.pdf (last visited Aug. 9, 2019).

seeing more data breaches reported than any other year since records first started being published."[31] As reflected in the chart below, many of the largest healthcare breaches over the last decade have involved millions of patient or member records.

## Largest Healthcare Data Breaches (2009-2018)

| Rank | Name of Covered Entity | Year | Covered Entity Type | Individuals Affected | Type of Breach |
|---|---|---|---|---|---|
| 1 | Anthem Inc. | 2015 | Health Plan | 78,800,000 | Hacking/IT Incident |
| 2 | Premera Blue Cross | 2015 | Health Plan | 11,000,000 | Hacking/IT Incident |
| 3 | Excellus Health Plan Inc. | 2015 | Health Plan | 10,000,000 | Hacking/IT Incident |
| 4 | Science Applications International Corporation | 2011 | Business Associate | 4,900,000 | Loss |
| 5 | University of California, Los Angeles Health | 2015 | Healthcare Provider | 4,500,000 | Hacking/IT Incident |
| 6 | Community Health Systems Professional Services Corporations | 2014 | Business Associate | 4,500,000 | Hacking/IT Incident |
| 7 | Advocate Medical Group | 2013 | Healthcare Provider | 4,029,530 | Theft |
| 8 | Medical Informatics Engineering | 2015 | Business Associate | 3,900,000 | Hacking/IT Incident |
| 9 | Banner Health | 2016 | Healthcare Provider | 3,620,000 | Hacking/IT Incident |
| 10 | Newkirk Products, Inc. | 2016 | Business Associate | 3,466,120 | Hacking/IT Incident |

---

[31] Healthcare Data Breach Statistics, HIPAA JOURNAL, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited Aug. 9, 2019).

44.     Defendants also observed numerous other well-publicized data breaches involving major corporations that were targeted given the sensitive consumer information they retained. For example, through a series of data breaches extending back to 2013, more than three billion Yahoo! user accounts were compromised when users' names, addresses, and dates of birth were stolen.[32]

45.     In separate incidents in 2013 and 2014, hundreds of millions of retail customers were victimized by hacks of payment card systems at Target and the Home Depot. Both breaches led to rampant payment card fraud and other damages both to consumers and to the card-issuing banks.[33]

46.     In September 2017, credit reporting agency Equifax announced that hackers stole the personal and financial information of 147 million Americans between May and July 2017.[34] The following year, hotel giant Marriott announced that 383 million guest records were exfiltrated from its hotel guest reservation database over four-year period.[35]

47.     Despite being a holder of Personal Information for millions of individuals nationwide, Defendants failed to prioritize data security by adopting reasonable data resources security measures to prevent and detect unauthorized access to its databases. Defendants had the resources to prevent a breach and made significant expenditures to promote their dental and

---

[32] S. Larson, *Every Single Yahoo Account was Hacked – 3 Billion in All*, CNN (OCT. 4, 2017), https://money.cnn.com/2017/10/03/technology/business/yahoo-breach-3-billion-accounts/index.html (last visited Aug. 9, 2019).

[33] B. Krebs, *Home Depot Hit By Same Malware as Target*, KREBS ON SECURITY (Sept. 7, 2014), https://krebsonsecurity.com/tag/home-depot-databreach/ (last visited Aug. 9, 2019).

[34] Equifax 2017 Cybersecurity Incident & Important Consumer Information, https://www.equifaxsecurity2017.com/frequently-asked-questions/ (last visited Aug. 9, 2019).

[35] Marriott Provides Update on Starwood Database Security Incident, https://news.marriott.com/2019/01/marriott-provides-update-on-starwood-database-security-incident/ (last visited Aug. 9, 2019).

vision plans, but neglected to adequately invest in data security, despite the growing number of well-publicized data breaches affecting insurance, healthcare, and other related industries.

**B. The Data Breach**

48.     On April 17, 2019, Dominion National received "an internal alert" on its systems and retained cyber-security firm FireEye Mandiant to conduct an investigation.[36]

49.     On April 24, 2019, Dominion National "determined that an unauthorized party may have accessed some of its computer servers" and that such access "may have occurred as early as August 25, 2010." According to the company, "Dominion National moved quickly to clean the affected servers. Dominion National has no evidence that any information was in fact accessed, acquired, or misused." [37]

50.     On June 21, 2019, Dominion National issued a press release entitled "Dominion National Identifies and Addresses Data Security Incident" stating that:

> Dominion National has undertaken a comprehensive review of the data stored or potentially accessible from those computer servers and has determined that the data may include enrollment and demographic information for current and former members of Dominion National and Avalon vision, as well as individuals affiliated with the organizations Dominion National administers dental and vision benefits for. The servers may have also contained personal information pertaining to plan producers and participating healthcare providers. The information varied by individual, but may include names in combination with addresses, email addresses, dates of birth, Social Security numbers, taxpayer identification numbers, bank account and routing numbers, member ID numbers, group numbers, and subscriber numbers.[38]

---

[36] Dominion Dental reports data security breach, MARYLAND HEALTH CONNECTION, https://www.marylandhealthconnection.gov/dominion-dental-reports-data-security-breach/ (last visited Aug. 9, 2019).

[37] Dominion National Identifies and Addresses Data Security Incident (June 21, 2019), https://www.prnewswire.com/news-releases/dominion-national-identifies-and-addresses-data-security-incident-300872972.html (last visited Aug. 9, 2019).

[38] *Id.*

51.     The release also referred victims to a website created by Dominion National (DominionNationalFacts.com) that included a message from Dominion National's president and provided additional information regarding the breach.

52.     On that website, Dominion National stated, "Safeguarding the privacy of your personal information is a top priority for us, and we make every effort to protect your information. Despite these efforts, Dominion National experienced a data security incident. We recognize the frustration and concern that this news may cause, and rest assured we are doing everything we can to protect your information moving forward."[39]

53.     The website also provided additional information about what information was accessed: "We have undertaken a comprehensive review of the data stored or potentially accessible from those computer servers and have determined that the data may include enrollment and demographic information for current and former members of Dominion National and Avalon vision, and current and former members of plans we provide administrative services for. In addition, the data may include personal information for producers who placed Dominion National and Avalon vision policies, and healthcare providers participating in the insurance programs of Dominion National. The member information may have included names, addresses, email addresses, dates of birth, Social Security numbers, member ID numbers, group numbers, and subscriber numbers. For members who enrolled online through Dominion National's website, their bank account and routing numbers may have also been included in the data. The provider information may have included names, dates of birth, Social Security numbers, and/or

---

[39] A message from Dominion National President, Mike Davis, https://dominionnationalfacts.com/ (last visited Aug. 9, 2019).

taxpayer identification numbers. The producer information may have included names and Social Security numbers."[40]

54.     Both Capital BlueCross and Avalon, on the front pages of their websites, linked to Dominion's website announcing the breach. Capital BlueCross's link stated, "Notice of Data Security Incident at Dominion National, administrator of BlueCross Dental":[41]



Notice of Data Security Incident at Dominion National, administrator of BlueCross Dental. 

55.     Similarly, Avalon's website announced: "Notice of Data Security Incident at Dominion National, administrator of Avalon vision coverage:"[42]

  

Notice of Data Security Incident at Dominion National, administrator of Avalon vision coverage. 

56.     Early reports suggest that 2,964,778 individuals were affected in the breach.[43] Dominion National stated that it began mailing notification letters to affected individuals on June 21, 2019.

57.     In its notice letter to affected individuals, Dominion National recommended that affected individuals "remain vigilant for incidents of fraud by monitoring your insurance statements and explanation of benefits. If you see services on your insurance statements or

---

[40] *Id.*

[41] Capital BlueCross, https://www.capbluecross.com/ (last visited Aug. 9, 2019).

[42] Avalon, https://www.avaloninsurance.com/ (last visited Aug. 9, 2019).

[43] 9-Year PHI Breach at Dominion National Impacted 2.9 Million Members, HIPAAnswers, (July 4, 2019), https://www.hipaanswers.com/9-year-phi-breach-at-dominion-national-impacted-2-9-million-members/ (last visited Aug. 9, 2019).

explanations of benefits that you did not receive, please call the member/customer services number on your member ID card. We also recommend that you monitor your financial account statements. If you see charges or activity you did not authorize, please contact your financial institution immediately."[44]

58.     Unfortunately, Dominion National's letter was deficient in providing meaningful notice because it failed to disclose precisely what information was accessed with respect to each affected individual. This is important because affected individuals may take different precautions depending on what type of information was compromised. For example, if member ID numbers, group numbers, and subscriber numbers were compromised, affected individuals may need to contact their insurance companies and medical providers to alert them of potential fraud. If Social Security Numbers and other identifying information was compromised, affected individuals may need to monitor their credit reports, contact the credit bureaus, or place credit freezes on their accounts. If bank account and routing numbers were compromised, affected individuals may need to contact their financial institutions, close their bank accounts, or contact the Internal Revenue Service to monitor for tax fraud. By failing to identify exactly who was affected or what information was compromised, Dominion National prevented affected individuals from taking meaningful, proactive, and targeted mitigation measures that could help protect them against severe harm.

59.     Dominion National also failed to disclose how it was alerted to the breach or explain how the breach went undiscovered for an unprecedented nine years. Experts agree that the extraordinary length of time the breach went undiscovered strongly suggests Dominion

---

[44] *See* Dominion National Sample Data Breach Notice Letter provided to California Attorney General, https://oag.ca.gov/system/files/Dominion%20National%20CA%20Individual%20Notices.pdf (last visited Aug. 9, 2019).

National failed to implement reasonable security measures or comply with industry-standard data security practices.

60.     For example, Fraser Kyne, Chief Technology Officer at cyber-security firm Bromium, stated in response to the Data Breach: "With highly sensitive data from home addresses, social security numbers and bank details exposed through the breached servers, the length of time this information was open to unauthorized access gives cause for great concern. Nine years is an incredibly long time for a hacker to remain undetected with this kind of access. The longer the 'dwell time' (i.e. the time a potential hacker has unauthorized access to systems), the more damage can be caused; hackers will have had ample opportunity to move through systems, potentially insert backdoors, exfiltrate data and spy on communications."[45]

61.     Kyne also noted that while it is unclear how the original breach occurred, the most common ways in are emails and browsers, which are accessed through the endpoint. "From there, hackers can make their way through systems to get to their target – in this case the company's servers," Kyne said. "Trying to detect an attack like that in real-time is a fallible approach, and once a hacker has made its way in they can deploy all manner of disguises to stay under the radar. This is why it's important to adopt layered defenses that utilize application isolation to contain malicious threats; preventing hackers from gaining a foothold in the network. That way, if a user does visit an infected site or open a malicious attachment then the malware is rendered harmless; the hacker has nowhere to go, nothing to steal and won't be able to reach company servers."[46]

---

[45] Alicja Grzadkowska, *Dominion National reveals data breach dating back to 2010*, INSURANCE BUSINESS AMERICA (June 26, 2019), https://www.insurancebusinessmag.com/us/news/cyber/dominion-national-reveals-data-breach-dating-back-to-2010-171071.aspx (last visited Aug. 9, 2019).
[46] *Id.*

62.     Clyde Hewitt, executive adviser at the security consulting firm CynergisTek, recognized that: "Given the length of time it has taken the company to detect this breach, the number of impacted patients could be extensive. Because the company also appears to be a third-party administrator to self-funded health plans, the number of other impacted covered entities could grow as well."[47]

63.     Hewitt also commented that the nine-year breach period "is unusual because it strongly suggests that [Dominion National] may not have been performing comprehensive security audits or performing system activity reviews."[48] Hewitt noted that organizations who report breaches after lengthy delays generally fit into one of two groups: "First, there are organizations that make a conscious decision to underfund their security program to the point that it is incapable of implementing a well-balanced security program being capable of detecting incidents. These organizations may be resource limited or simply haven't translated security into business impacts," said Hewitt. The second group includes organizations with security staff that are "over confident in their own abilities and are unwilling or unable to report the true security posture to senior leadership. This second scenario is common when security responsibilities are assigned to the CIO without having an independent security leader to balance the discussion," he said. "It is also common when individuals are filling security roles without the benefit of appropriate training."[49]

64.     Tom Walsh, president of the consultancy tw-Security, stated: "I am surprised that they detected it dating that far back. Most organizations do not retain audit logs or event logs for

---

[47] Marianne McGee, *Insurer: Breach Undetected for Nine Years*, BANKINFOSECURITY (June 26, 2019), https://www.bankinfosecurity.com/insurer-breach-undetected-for-nine-years-a-12694 (last visited Aug. 9, 2019).

[48] *Id.*

[49] *Id.*

that long. Most disturbing is that an intruder or a malicious program or code could be into the systems and not previously detected. Nine years is beyond the normal refresh lifecycle for most servers. I would have thought that it could have been detected during an upgrade or a refresh of the hardware."[50]

65.     Indeed, the extraordinary length of time the breach went undiscovered strongly suggests that Dominion National: (a) did not regularly update its software or equipment; (b) did not have a sufficient Security Incident & Event Management (SIEM) process in place to identify, monitor, and analyze IT-security events in real time; (c) failed to adequately monitor or log remote access onto its networks; (d) failed to undertake comprehensive security audits or performing system activity reviews; (e) failed to utilize and run malware and virus detection software; and (f) failed to comply with industry-standard data security measures.

## C.  Plaintiffs' Individual Allegations

66.     Plaintiff Sayed Abubaker provided his Personal Information to Dominion National and Avalon in order to obtain vision insurance. Plaintiff Abubaker received a letter from Dominion National dated June 21, 2019 informing him that his Personal Information had been compromised in the Data Breach. As a result of the Data Breach, Plaintiff Abubaker purchased Privacy Guard for $10 per month. He has also expended time and effort monitoring his financial accounts, one account of which has experienced illegal activity over the past year that may have been connected to the Data Breach.  Given the highly-sensitive nature of the information stolen, Plaintiff Abubaker remains at a substantial and imminent risk of future harm.

67.     Plaintiff Joseph Cardiff provided his Personal Information to Dominion National and Avalon in order to obtain vision insurance. Plaintiff Cardiff received a letter from Dominion

---

[50] *Id.*

National dated June 21, 2019 informing him that his Personal Information had been compromised in the Data Breach. As a result of the Data Breach, Plaintiff Cardiff purchased Home Title Watch Protection for $200 per year. He has also expended time and effort monitoring his financial accounts in order to mitigate against potential harm.  Given the highly-sensitive nature of the information stolen, Plaintiff Cardiff remains at a substantial and imminent risk of future harm.

68.     Plaintiff Daniel Cho is an in-network provider of dental services for Dominion National and supplied his Personal Information to Dominion National for that purpose. Plaintiff Cho received a letter from Dominion National dated June 21, 2019 informing him that his Personal Information had been compromised in the Data Breach. As a result of the Data Breach, Plaintiff Cho expended time and effort regularly monitoring his financial accounts and credit score in order to mitigate against potential harm. Given the highly-sensitive nature of the information stolen, Plaintiff Cho remains at a substantial and imminent risk of future harm.

69.     Plaintiff Magdalyne Hilliard provided her Personal Information to BlueCross Dental in order to obtain dental insurance. Plaintiff Hilliard received a letter from Dominion National dated June 21, 2019 informing her that her Personal Information had been compromised in the Data Breach. As a result of the Data Breach, Plaintiff Hilliard expended time and effort monitoring her credit score in order to mitigate against potential harm, and Plaintiff Hilliard also contacted the IRS about funds owed, which may have been a result of the Data Breach. Given the highly-sensitive nature of the information stolen, Plaintiff Hilliard remains at a substantial and imminent risk of future harm.

**D.  Defendants Had an Obligation to Protect Personal Information Under Federal Law**

70.     While Dominion National had its systems breached, all Defendants had a non-delegable duty to ensure that all information they collected and stored was secure, and that any

associated entities with whom they shared member information maintained adequate and commercially-reasonable data security practices to ensure the protection of plan members' Personal Information.

71.     Defendants are entities covered by HIPAA (*see* 45 C.F.R. § 160.102) and as such are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

72.     These rules establish national standards for the protection of patient information, including protected health information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. *See* 45 C.F.R. § 160.103.

73.     HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."[51]

74.     HIPAA requires that Defendants implement appropriate safeguards for this information.[52]

75.     HIPAA requires that Defendants provide notice of a breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons – i.e. non-encrypted data.[53]

---

[51] 45 C.F.R. § 164.502.
[52] 45 C.F.R. § 164.530(c)(1).
[53] 45 C.F.R. § 164.404; 45 C.F.R. § 164.402.

76.     Despite these requirements, Defendants failed to comply with their duties under HIPAA and their own Privacy Practices. Indeed, Defendants failed to:

a.  Maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.  Adequately protect Plaintiff's and the Class Members' Personal Information;

c.  Ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d.  Implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e.  Implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f.  Implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g.  Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

> h.  Ensure compliance with the electronically protected health information security standard rules by their workforces, in violation of 45 C.F.R. § 164.306(a)(4); and/or
>
> i.  Train all members of their workforces effectively on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of protected health information, in violation of 45 C.F.R. § 164.530(b).

77.  Defendants failed to comply with their duties under HIPAA and their own Codes of Conduct and Privacy Policies despite each being aware of the risks associated with unauthorized access of members' Personal Information.

## E. Defendants Failed to Comply with Regulatory Guidance

78.  Federal agencies have issued recommendations and guidelines to temper data breaches and the resulting harm to individuals and financial institutions. For example, the Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[54]

79.  In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[55] Among other things, the guidelines note businesses should protect the personal customer information that they keep; properly dispose of personal information that is no

---

[54] Federal Trade Commission, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Aug. 9, 2019).

[55] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Aug. 9, 2019).

longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[56]

80.     Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[57]

81.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[58]

82.     In this case, Defendants were fully aware of their obligation to use reasonable measures to protect the personal information of its customers, acknowledging as much in their own privacy policies. Defendants also knew they were targets for hackers. But despite

---

[56] *Id.*

[57] FTC, *Start With Security*, *supra* note 54.

[58] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Aug. 9, 2019).

understanding the consequences of inadequate data security, Defendants failed to comply with industry-standard data security requirements.

83.     Defendants failure to employ reasonable and appropriate measures to protect against unauthorized access to members' information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**F.  The Effect of the Data Breach on Affected Individuals**

84.     Given the sensitive nature of the Personal Information stolen in the Data Breach – including names, addresses, email addresses, dates of birth, Social Security numbers, taxpayer identification numbers, member ID numbers, group numbers, subscriber numbers, and bank account and routing numbers – hackers have the ability to commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and into the indefinite future.

85.     In fact, many victims of the Data Breach have likely already experienced harms as the result of the Data Breach, including, but not limited to, identity theft, financial fraud, tax fraud, unauthorized lines of credit opened in their names, medical and healthcare fraud, and unauthorized access to their bank accounts. Plaintiffs and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit protection services, contacting their financial institutions, checking credit reports, and spending time and effort searching for unauthorized activity.

86.     The Personal Information exposed in the Data Breach is highly-coveted and valuable on underground or black markets. For example, a cyber "black market" exists in which criminals openly post and sell stolen consumer information on underground internet websites known as the "dark web" – exposing consumers to identity theft and fraud for years to come. Identity thieves can use the Personal Information to: (a) create fake credit cards that can be

swiped and used to make purchases as if they were the real credit cards; (b) reproduce stolen debit cards and use them to withdraw cash from ATMs; (c) commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name; (e) obtain fraudulent government benefits; (f) file a fraudulent tax return using the victim's information; (g) commit medical and healthcare-related fraud; (h) access financial accounts and records; or (i) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

87.     And, the impact of identity theft can have ripple effects, which can adversely affect the future financial trajectories of victims' lives. For example, the Identity Theft Resource Center reports that respondents to their surveys in 2013-2016 described that the identity theft they experienced affected their ability to get credit cards and obtain loans, such as student loans or mortgages.[59] For some victims, this could mean the difference between going to college or not, becoming a homeowner or not, or having to take out a high interest payday loan versus a lower-interest loan.

88.     It is no wonder then that identity theft exacts a severe emotional toll on its victims. The 2017 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed

- 67% reported anxiety

- 66% reported feelings of fear related to personal financial safety

- 37% reported fearing for the financial safety of family members

- 24% reported fear for their physical safety

---

[59] Identity Theft Resource Center, *The Aftermath 2017*, https://www.idtheftcenter.org/images/page-docs/Aftermath_2017.pdf (last visited Aug. 9, 2019).

- 15.2% reported a relationship ended or was severely and negatively impacted by the identity theft

- 7% reported feeling suicidal.[60]

89.     Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances

- 37.1% reported an inability to concentrate / lack of focus

- 28.7% reported they were unable to go to work because of physical symptoms

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues)

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[61]

90.     Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[62]

---

[60] *Id.*

[61] *Id.*

[62] FTC, *Combating Identity Theft A Strategic Plan* (April 2007), available at https://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf (last visited Aug. 9, 2019).

91.     The unauthorized disclosure of Social Security Numbers can be particularly damaging because Social Security Numbers cannot easily be replaced. In order to obtain a new number, a person must prove, among other things, he or she continues to be disadvantaged by the misuse. Thus, under current rules, no new number can be obtained until the damage has been done. Furthermore, as the Social Security Administration warns:

> A new number probably will not solve all your problems. This is because other governmental agencies (such as the Internal Revenue Service and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Also, because credit reporting companies use the number, along with other Personal Information, to identify your credit record, using a new number will not guarantee you a fresh start. This is especially true if your other Personal Information, such as your name and address, remains the same.

> If you receive a new Social Security Number, you will not be able to use the old number anymore.

> For some victims of identity theft, a new number actually creates new problems. If the old credit card information is not associated with the new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[63]

92.     As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.      purchasing services they would not have otherwise paid for and/or paying more for services than they otherwise would have paid, had they known the truth about Defendants' sub-standard data security practices;

b.      losing the inherent value of their Personal Information;

c.      losing the value of the explicit and implicit promises of data security;

d.      identity theft and fraud resulting from the theft of their Personal Information;

---

[63] Social Security Administration, *Identity Theft and Your Social Security Number* (June 2017), available at http://www.ssa.gov/pubs/10064.html (last visited Aug. 9, 2019).

e.      costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

f.      costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

g.      unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

h.      lowered credit scores resulting from credit inquiries following fraudulent activities;

i.      costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with the repercussions of the Data Breach; and

j.      the continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their Personal Information being in the possession of one or many unauthorized third parties.

93.     Even in instances where a consumer is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement that is not refunded. The Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[64]

94.     There may also be a significant time lag between when personal information is stolen and when it is actually misused. According to the GAO, which conducted a study regarding data breaches:

---

[64] E. Harrell, U.S. Department of Justice, *Victims of Identity Theft, 2014* (revised Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Aug. 9, 2019).

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[65]

95.     Plaintiffs and Class Members place significant value in data security. According to a recent survey conducted by cyber-security company FireEye, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[66]

96.     Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, Defendants would have no reason to tout their data security efforts to their actual and potential customers.

97.     Consequently, had consumers known the truth about Defendants' data security practices – that they did not adequately protect and store their Personal Information – they would not have purchased health plans from Defendants and/or would have paid significantly less. As such, Plaintiffs and Class Members did not receive the benefit of their bargain with Defendants because they paid for the value of services they expected but did not receive.

---

[65] U.S. Government Accountability Office Report to Congressional Requesters, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), http://www.gao.gov/new.items/d07737.pdf (last visited Aug. 9, 2019).

[66] FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 2016), https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited Aug. 9, 2019).

## CLASS ACTION ALLEGATIONS

98.     Plaintiffs seek relief on behalf of themselves and as representatives of all others

who are similarly situated. Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3)

and/or (c)(4), Plaintiffs seek certification of a nationwide class defined as follows:

> All persons in the United States whose Personal Information was compromised as
> a result of the data breach announced by Dominion National on or about June 21,
> 2019 (the "Class" or "Nationwide Class").

99.     Pursuant to Rule 23, Plaintiffs assert claims under the law of the states of Georgia,

Pennsylvania, and Washington D.C., on behalf of separate statewide classes, defined as follows:

> All persons in the State of Georgia whose Personal Information was compromised
> as a result of the data breach announced by Dominion National on or about June
> 21, 2019 (the "Georgia Subclass").

> All persons in the State of Pennsylvania whose Personal Information was
> compromised as a result of the data breach announced by Dominion National on
> or about June 21, 2019 (the "Pennsylvania Subclass").

> All persons in the District of Columbia whose Personal Information was
> compromised as a result of the data breach announced by Dominion National on
> or about June 21, 2019 (the "District of Columbia Subclass").

100.    Excluded from each of the above Classes are Defendants, any entity in which

Defendants have a controlling interest, and Defendants' officers, directors, legal representatives,

successors, subsidiaries, and assigns. Also excluded are all persons who make a timely election

to be excluded from the Class and any judicial officer presiding over this matter, members of

their immediate family, and members of their judicial staff.

101.    Plaintiffs hereby reserve the right to amend or modify the class definition with

greater specificity or division after having had an opportunity to conduct discovery.

102.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the

members of the Class are so numerous and geographically dispersed that the joinder of all

members is impractical. While the exact number of Class Members is unknown to Plaintiffs at

this time, the proposed Class includes potentially millions of individuals whose Personal Information was compromised in the Data Breach. Class Members may be identified through objective means. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include electronic mail, U.S. mail, internet postings, and/or published notice.

103.    **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

    a.  Whether Defendants knew or should have known of the susceptibility of Dominion National's systems to a data breach;

    b.  Whether Defendants failed to implement reasonable and adequate security procedures and practices;

    c.  Whether Dominion National's security measures to protect its systems were reasonable in light known legal requirements;

    d.  Whether Defendants' efforts (or lack thereof) to ensure the security of members' Personal Information provided to Dominion National were reasonable in light of known legal requirements;

    e.  Whether Defendants owed a duty to Plaintiff and Class Members to protect their Personal Information;

    f.  Whether Defendants breached their duty to protect the Personal Information of Plaintiff and Class Members by failing to provide adequate data security;

g.  Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the breach of Dominion National's systems and/or the loss of the Personal Information of Plaintiffs and Class Members;

h.  Whether Defendants had a contractual obligation to use reasonable security measures and whether they complied with such contractual obligations;

i.  Whether Defendants' conduct amounted to violations of state consumer protection statutes, and/or state data breach statutes;

j.  Whether, as a result of Defendants' conduct, Plaintiffs and Class Members face a significant threat of harm and/or have already suffered harm, and, if so, the appropriate measure of damages to which they are entitled; and,

k.  Whether, as a result of Defendants' conduct, Plaintiffs and Class Members are entitled to injunctive, equitable, declaratory, and/or other relief, and, if so, the nature of such relief.

104.  **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with Rule 23(a)(3), Plaintiffs' claims are typical of those of other Class Members. Plaintiffs' Personal Information was in Defendants' possession at the time of the Data Breach and was compromised as a result of the Data Breach. Plaintiffs' damages and injuries are akin to other Class Members and Plaintiffs seek relief consistent with the relief of the Class.

105.  **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate class representatives because their interests do not conflict with the interests of Class Members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation and data breach litigation, and Plaintiffs intend to prosecute

this action vigorously. The Class Members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

106.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and Class Members are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

107.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

108.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to:

a.   Whether Defendants' owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, and safeguarding their Personal Information;

b.   Whether Defendants failed to take reasonable steps to safeguard the Personal Information of Plaintiffs and Class Members;

c.   Whether Defendants failed to adequately monitor and audit the data security systems of Dominion National.

**CAUSES OF ACTION**

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Class, or alternatively, Plaintiffs and their respective Subclasses against Defendants)**

109.   Plaintiffs restate and re-allege the preceding paragraphs as if fully set forth herein.

110.   Defendants required Plaintiffs and Class Members to submit Personal Information to obtain health insurance services, and in some instances, shared member data amongst each other in order to administer insurance benefits. Defendants collected and stored the data for commercial gain.

111.   Defendants had a non-delegable duty to ensure that the information they collected and stored and that any associated entities with whom they shared patient information maintained adequate and commercially-reasonable data security practices to ensure the protection of members' Personal Information.

112.   Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting the Personal Information within their control from being compromised, lost, stolen, accessed and misused by unauthorized persons.

113. Defendants owed a duty of care to Plaintiffs and Class Members to provide security, consistent with industry standards, to ensure that the systems and networks adequately protected the Personal Information.

114. Defendants' duty to use reasonable care in protecting Personal Information arose as a result of the common law and the statutes and regulations, such as the HIPAA regulations described above, as well as their own promises regarding privacy and data security to their patients.

115. Defendants knew, or should have known, of the risks inherent in collecting and storing Personal Information, the vulnerabilities in Dominion National's systems, and the importance of adequate security.

116. Defendants breached their common law, statutory, and other duties – and thus were negligent – by failing to use reasonable measures to protect patients' Personal Information, and by failing to provide timely and adequately detailed notice of the Data Breach.

117. Defendants breached their duties to Plaintiffs and Class Members in numerous ways, including by:

   a. failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the Personal Information of Plaintiffs and Class Members;

   b. failing to comply with industry standard data security standards during the period of the Data Breach;

   c. failing to comply with regulations protecting the Personal Information at issue during the period of the Data Breach;

d.      failing to adequately monitor, evaluate, and ensure the security of Dominion National's network and systems;

e.      failing to recognize in a timely manner that the Personal Information of Plaintiffs and Class Members had been compromised;

f.      failing to timely and adequately disclose that the Personal Information of Plaintiffs and Class Members had been compromised.

118.    Plaintiffs' and Class Members' Personal Information would not have been compromised but for Defendants' wrongful and negligent breach of their duties.

119.    Defendants failure to take proper security measures to protect sensitive Personal Information of Plaintiffs and Class Members as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Personal Information of Plaintiffs and Class Members.

120.    It was also foreseeable that Defendants' failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiffs and Class Members.

121.    Neither Plaintiffs nor Class Members contributed to the Data Breach and subsequent misuse of their Personal Information as described in this Complaint.

122.    As a direct and proximate cause of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury and damages described herein, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their Personal Information is used; (ii) the publication and/or theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to

mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Personal Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Personal Information of current and former members in its continued possession; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Personal Information for the indefinite future.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class, or alternatively, Plaintiffs and their respective Subclasses against Defendants)**

123.    Plaintiffs restate and re-allege the preceding paragraphs as if fully set forth herein.

124.    HIPAA requires Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). The confidential data at issue in this case constitutes "protected health information" within the meaning of HIPAA.

125.    HIPAA further requires Defendants to disclose the unauthorized access and theft of the Personal Information to Plaintiffs and the Class "without unreasonable delay" so that Plaintiffs and Class Members can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Personal Information. *See* 45 C.F.R. § 164.404.

126.     Defendants violated HIPAA by failing to reasonably protect Plaintiffs' and Class Members' Personal Information, as described herein.

127.     Defendants' violations of HIPAA constitute negligence *per se*.

128.     Plaintiffs and Class Members are within the class of persons that HIPAA was intended to protect.

129.     The harm that occurred as a result of the Data Breach is the type of harm HIPAA was intended to guard against.

130.     Additionally, Section 5 of the Federal Trade Commission Act ("FTC Act") prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Personal Information. 15 U.S.C. § 45(a)(1).

131.      The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

132.     Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Personal Information and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of Personal Information they obtained, stored, and disseminated in the regular course of their business, and the foreseeable consequences of a data breach, including, specifically, the significant damage that would result to Plaintiffs and Class Members.

133.     Defendants' violations of Section 5 of the FTC Act constitute negligence *per se*.

134.     Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

135.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

136.     As a direct and proximate result of Defendants' negligence *per se* under HIPAA and the FTC Act, Plaintiffs and Class Members have suffered, continue to suffer, and will suffer, injuries, damages, and harm as set forth herein.

## COUNT III
## BREACH OF CONTRACT
**(On Behalf of Plaintiffs and the Class, or alternatively, Plaintiffs and their respective Subclasses against Defendants)**

137.     Plaintiffs restate and re-allege the preceding paragraphs as if fully set forth herein.

138.     Defendants each maintained a "Notice of Privacy Practices" ("Notice") which constitute an agreement between Defendants and persons who provided their Personal Information to Defendants, including Plaintiffs and Class Members.

139.     Plaintiffs and Class Members formed a contract with Defendants when they provided Personal Information to Defendants subject to the Notice.

140.     Defendants' Notice states that they "are legally required to follow the privacy practices that are described in this notice" including (a) implementing policies and procedures throughout their organization to protect members' Personal Information; (b) training all employees on appropriate uses, disclosures, and protection of PHI; (c) limiting employee system access to only the PHI needed to perform job duties; (d) ensuring secure disposal of confidential information; and (e) using unique user IDs and passwords, etc.

141.    Defendants breached their agreement with Plaintiffs and Class Members by failing to protect their Personal Information, including failing to comply with the promises and obligations set forth in the Notice.

142.    As a direct and proximate result of these breaches, Plaintiffs and Class Members sustained actual losses and damages as described in detail above, including that they did not receive the benefits of the bargains for which they paid.

143.    Additionally, Dominion National's "Computer Use and Information Security Policy" constitutes an agreement between Defendant Dominion National and persons who provided their Personal Information to Dominion National.

144.    Plaintiffs and Class Members who provided their Personal Information to Dominion National formed a contract with Dominion National when they their information subject to the Computer Use and Information Security Policy.

145.    Dominion National's Computer Use and Information Security Policy states that it will undertake certain obligations to ensure members' Personal Information "will be kept private and will not be disclosed to unauthorized parties" including (a) limiting information access; (b) maintaining computer security; (c) implementing device and media control measures to protect Personal Information; (d) implementing virus and malicious software protection; (e) restricting access to Personal Information via electronic mail and the internet; and (f) limiting remote access to Dominion National's computing environment.

146.    Dominion National breached its agreement with Plaintiffs and Class Members who provided their Personal Information to Dominion National by failing to protect their Personal Information, including failing to comply with the promises and obligations set forth in the Computer Use and Information Security Policy.

147.    As a direct and proximate result of these breaches, Plaintiffs and Class Members who provided their Personal Information to Dominion National sustained actual losses and damages as described in detail above, including that they did not receive the benefits of the bargains for which they paid.

## COUNT IV
### BREACH OF CONTRACT AS THIRD-PARTY BENEFICIARIES
**(On Behalf of Plaintiffs and the Class, or alternatively, Plaintiffs and their respective Subclasses against Defendants)**

148.    Plaintiffs restate and re-allege the preceding paragraphs as if fully set forth herein.

149.    Defendants each maintain a "Code of Conduct" that constitutes an agreement between Defendants and their respective employees, officers, committee members, and directors.

150.    The Code of Conduct was entered into for the express benefit of current and former plan members including Plaintiffs and Class Members.

151.    Plaintiffs and members of the Class are third-party beneficiaries to Defendants' Codes of Conduct.

152.    Defendants breached their agreements and duties and obligations to Plaintiffs and Class Members by failing to protect their Personal Information, including failing to comply with the promises and obligations set forth in the Codes of Conduct. This included failing to:

   a. "[P]rotect[] confidential information, including employee and member information";

   b. Undertake "[r]easonable caution … to maintain physical, electronic, and procedural safeguards to protect [members'] personal data";

   c. Fulfill their "obligation to diligently protect the privacy and the security of [members'] information";

    d.   "[E]nsur[e] that PHI is safeguarded, not only in the Company's computer systems

and filing cabinets, but in every way that we use and share it."

153.    As a direct and proximate result of these breaches, Plaintiffs and Class Members

sustained actual losses and damages as described in detail above, including that they did not

receive the benefits of the bargains for which they paid.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class, or alternatively, Plaintiffs and their respective**
**Subclasses against Defendants)**

154.    Plaintiffs restate and re-allege the preceding paragraphs as if fully set forth herein,

and assert this claim in the alternative to their breach of contract claims to the extent necessary.

155.    Plaintiffs and Class Members were required to provide their Personal Information,

including names, addresses, Social Security numbers, financial information, and other personal

information to Defendants in order to enroll in health plans.

156.    As part of these transactions, Defendants agreed to safeguard and protect the

Personal Information of Plaintiffs and Class Members. Implicit in the agreements between

Defendants and Class Members was the obligation that Defendants would use the Personal

Information for approved business purposes only and would not make unauthorized disclosures

of the information or allow unauthorized access to the information.

157.    Additionally, Defendants implicitly promised to retain this Personal Information

only under conditions that kept such information secure and confidential and therefore had a duty

to reasonably safeguard and protect the Personal Information of Plaintiffs and Class Members

from unauthorized disclosure or access.

158.    Plaintiffs and Class Members entered into implied contracts with the reasonable

expectation that Defendants' data security practices and policies were reasonable and consistent

46

with industry standards. Plaintiffs and Class Members believed that Defendants would use part of the monies paid to Defendants under the implied contracts to fund adequate and reasonable data security practices.

159.    Plaintiffs and Class Members would not have provided and entrusted their Personal Information to Defendants or would have paid less for Defendants' services in the absence of the implied contract or implied terms between them and Defendants. The safeguarding of the Personal Information of Plaintiffs and Class Members was critical to realize the intent of the parties.

160.    Defendants breached their implied contract with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' Personal Information, which was compromised as a result of the Data Breach.

161.    Defendants acts and omissions have materially affected the intended purpose of the implied contracts, which required Plaintiffs and Class Members to provide their Personal Information in exchange for enrollment in health plans and insurance benefits.

162.    As a direct and proximate result of Defendants' breaches, Plaintiffs and Class Members sustained actual losses and damages as described in detail above, including that they did not receive the benefits of the bargains for which they paid.

## COUNT VI
## UNJUST ENRICHMENT
**(On Behalf of Plaintiffs and the Class, or alternatively, Plaintiffs and their respective Subclasses against Defendants)**

163.    Plaintiffs restate and re-allege the preceding paragraphs as if fully set forth herein, and assert this claim in the alternative to their breach of contract claims to the extent necessary.

164.     Plaintiffs and Class Members have an interest, both equitable and legal, in the Personal Information about them that was conferred upon, collected by, and maintained by Defendants and which was ultimately stolen in the Data Breach.

165.     Plaintiffs and Class Members conferred a monetary benefit on Defendants in the form of premiums paid for the purchase of health insurance and health benefits services.

166.     Defendants appreciated and had knowledge of the benefits conferred upon them by Plaintiffs and Class Members.

167.     The premiums for health insurance and health benefits services that Plaintiffs and Class Members paid (directly or indirectly) to Defendants should have been used by Defendants, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

168.     As a result of Defendants' conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between health insurance and health benefit services with the reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and the inadequate health insurance and health benefits services without reasonable data privacy and security practices and procedures that they received.

169.     Under principals of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members because Defendants failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiffs and Class Members paid for and that were otherwise mandated by HIPAA regulations, federal, state and local laws, and industry standards.

170.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds they received.

171.    Equity and good conscience require restitution by the Defendants in the amount of the benefit conferred on Defendants as a result of their wrongful conduct, including, specifically, the value to Defendants of the Personal Information that was stolen in the Defendants' Data Breach and the resulting profits Defendants received and are receiving from the use of that information. Further, Defendants should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendants' services.

**COUNT VII**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Class against Defendants)**

172.    Plaintiffs restate and re-allege the preceding paragraphs as if fully set forth herein.

173.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the state and federal statutes described in this Complaint.

174.    An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard its customers' Personal Information and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their Personal Information. Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise

of their Personal Information and remain at imminent risk that further compromises of their Personal Information will occur in the future.

175.    Defendants still possess Personal Information pertaining to Plaintiffs and Class Members, which means the Personal Information remains at risk of further breaches.

176.    Accordingly, Defendants have not satisfied their contractual obligations and legal duties to Plaintiffs and Class Members. In fact, now that Defendants' lax approach towards data security has become public, Class Members' Personal Information is more vulnerable than it was prior to announcement of the Data Breach.

177.    Actual harm has arisen in the wake of the Data Breach regarding Defendants' contractual obligations and duties of care to provide data security measures to Plaintiffs and Class Members.

178.    Pursuant to the Declaratory Judgment Act, Plaintiffs seek a declaration that (a) Defendants' existing data security measures do not comply with their contractual obligations and duties of care, and (b) in order to comply with its contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

     a.     Modifying their practices and policies to ensure they and any business associates to which they provide members' Personal Information engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on their systems on a periodic basis, and ordering vendors to promptly correct any problems or issues detected by such third-party security auditors;

b.      Modifying their practices and policies to ensure they and any business associates to which they provide members' Personal Information engage third-party security auditors and internal personnel to run automated security monitoring;

c.      Modifying their practices and policies to ensure they and any business associates to which they provide members' Personal Information audit, test, and train security personnel regarding any new or modified procedures;

d.      Modifying their practices and policies to ensure they and any business associates to which they provide members' Personal Information segment Personal Information by, among other things, creating firewalls and access controls so that if one area of a system is compromised, hackers cannot gain access to other portions of the systems;

e.      Modifying their practices and policies to ensure Personal Information not necessary for the provision of services is purged, deleted, and destroyed, and to ensure its business associates likewise purge, delete, and destroy such Personal Information;

f.      Conducting regular data security audits of any business associates to which they provide members' Personal Information;

g.      Routinely and continually conduct internal training and education to inform internal security personnel how to monitor data security or the data security of business associates to whom patients' Personal Information is provided; and

h.      Educating their members about the threats they face as a result of the loss of the financial and personal information to third parties, as well as the steps affected individuals must take to protect themselves.

**COUNT VIII**
**VIOLATION OF GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT,**
**Ga. Code Ann. §§ 10-1-370, *et seq*.**
**(On Behalf of Plaintiff Daniel Cho and the Georgia Subclass against Defendants)**

179.    Plaintiff Daniel Cho ("Plaintiff," for purposes of this Count), individually and on behalf of the Georgia Subclass restates and re-alleges the preceding paragraphs as if fully set forth herein.

180.    Defendants, Plaintiff, and Georgia Subclass Members are "persons" within the meaning of § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA").

181.    Defendants engaged in deceptive trade practices in the conduct of its business, in violation of Ga. Code § 110-1-372(a), including:

a.  Representing that goods or services have characteristics that they do not have;

b.  Representing that goods or services are of a particular standard, quality, or grade if they are of another;

c.  Advertising goods or services with intent not to sell them as advertised;

d.  Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

182.    Defendants' deceptive trade practices include:

a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Georgia Subclass Members' Personal Information, which was a direct and proximate cause of the Data Breach;

b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures

following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Georgia Subclass Members' Personal Information, including duties imposed by HIPAA and the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.   Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and Georgia Subclass Members' Personal Information, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Georgia Subclass Members' Personal Information, including duties imposed by HIPAA and the FTC Act, 15 U.S.C. § 45;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Georgia Subclass Members' Personal Information; and

g.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Georgia Subclass Members' Personal Information, including duties imposed by HIPAA and the FTC Act, 15 U.S.C. § 45.

183.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Personal Information.

184.    Defendants intended to mislead Plaintiff and Georgia Subclass Members and induce them to rely on its misrepresentations and omissions.

185.    Defendants acted intentionally, knowingly, and maliciously to violate Georgia's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Georgia Subclass Members' rights. Breaches within the insurance and health industry put Defendants on notice that their security and privacy protections were inadequate.

186.    Had Defendants disclosed to Plaintiff and Georgia Subclass Members that its data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendants received, maintained, and compiled Plaintiff's and Georgia Subclass Members' Personal Information as part of the services Defendants provided and for which Plaintiff and Georgia Subclass Members paid without advising that Defendants' data security practices were insufficient to maintain the safety and confidentiality of Plaintiff's and Georgia Subclass Members' Personal Information. Accordingly, Plaintiff and the Georgia Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

187.    As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff and Georgia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendants as they would not have paid Defendants for goods and services or would have paid less for such goods and services but for Defendants' violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for

fraudulent activity; loss of value of their Personal Information; and an increased, imminent risk of fraud and identity theft.

188.     Plaintiff and Georgia Subclass members seek all relief allowed by law, including injunctive relief, and reasonable attorneys' fees and costs, under Ga. Code § 10-1-373

## COUNT IX
### VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES & CONSUMER PROTECTION LAW, 73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq.*
### (On Behalf of Plaintiffs Joseph Cardiff and Magdalyne Hilliard and the Pennsylvania Subclass against Defendants)

189.     Plaintiffs Joseph Cardiff and Magdalyne Hilliard ("Plaintiff," for purposes of this Count), individually and on behalf of the Pennsylvania Subclass, restate and re-allege the preceding paragraphs as if fully set forth herein

190.     Defendants are "persons", as meant by 73 Pa. Cons. Stat. § 201-2(2).

191.     Plaintiff and Pennsylvania Subclass Members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

192.     Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. § 201-3, including the following:

   a.   Representing that its goods and services have characteristics, uses, benefits, and qualities that they do not have (73 Pa. Stat. Ann. § 201-2(4)(v));

   b.   Representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Stat. Ann. § 201-2(4)(vii)); and

   c.   Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. Ann. § 201-2(4)(ix)).

193.    Defendants unfair or deceptive acts and practices include:

a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Pennsylvania Subclass Members' Personal Information, which was a direct and proximate cause of the Data Breach;

b.  Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Pennsylvania Subclass Members' Personal Information, including duties imposed by HIPAA and the FTC Act, 15 U.S.C. § 45;

d.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and Pennsylvania Subclass members' Personal Information, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Pennsylvania Subclass members' Personal Information, including duties imposed by HIPAA and the FTC Act, 15 U.S.C. § 45;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Pennsylvania Subclass members' Personal Information; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Pennsylvania Subclass members' Personal Information, including duties imposed by HIPAA and the FTC Act, 15 U.S.C. § 45.

194. Defendants representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Personal Information.

195. Defendants intended to mislead Plaintiff and Pennsylvania Subclass members and induce them to rely on its misrepresentations and omissions.

196. Had Defendants disclosed to Plaintiff and Pennsylvania Subclass Members that its data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendants received, maintained, and compiled Plaintiff's and Pennsylvania Subclass Members' Personal Information as part of the services Defendants provided and for which Plaintiff and Pennsylvania Subclass Members paid without advising that Defendants' data security practices were insufficient to maintain the safety and confidentiality of Plaintiff's and Pennsylvania Subclass Members' Personal Information. Accordingly, Plaintiff and the Pennsylvania Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

197. Defendants acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiff and Pennsylvania Subclass Members' rights. Data breaches within the insurance and

health industry put Defendants on notice that their security and privacy protections were inadequate.

198.    As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices and Plaintiff's and the Pennsylvania Subclass Members' reliance on them, Plaintiff and Pennsylvania Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendants as they would not have paid Defendants for goods and services or would have paid less for such goods and services but for Defendants' violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Personal Information; and an increased, imminent risk of fraud and identity theft.

199.    Plaintiff and Pennsylvania Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, restitution, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

**COUNT X**
**VIOLATION OF DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT,**
**D.C. Code §§ 28-3904,** *et seq.*
**(On Behalf of Plaintiff Sayed Abubaker and the District of Columbia Subclass against Defendants)**

200.    Plaintiff Abubaker ("Plaintiff," for purposes of this Count), individually and on behalf of the District of Columbia Subclass, restates and re-alleges the preceding paragraphs as if fully set forth herein.

201.    Defendants are "persons" as defined by D.C. Code § 28-3901(a)(1).

202.    Defendants are "merchants" as defined by D.C. Code § 28-3901(a)(3).

203.    Plaintiff and District of Columbia Subclass Members are "consumers" who purchased or received goods or services for personal, household, or family purposes, as defined by D.C. Code § 28-3901.

204.    Defendants advertised, offered, or sold goods or services in the District of Columbia and engaged in trade or commerce directly or indirectly affecting the people of the District of Columbia.

205.    Defendants engaged in unfair, unlawful, and deceptive trade practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of goods and services in violation of D.C. Code § 28-3904, including:

    a.  Representing that goods or services have characteristics that they do not have;

    b.  Representing that goods or services are of a particular standard, quality, grade, style, or model, when they are of another;

    c.  Misrepresenting a material fact that has a tendency to mislead;

    d.  Failing to state a material fact where the failure is misleading;

    e.  Advertising or offering goods or services without the intent to sell them as advertised or offered;

    f.  Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

206.    Defendants' unfair, unlawful, and deceptive trade practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and District of Columbia Subclass Members' Personal Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and District of Columbia Subclass Members' Personal Information, including duties imposed by HIPAA and the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and District of Columbia Subclass Members' Personal Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and District of Columbia Subclass Members' Personal Information, including duties imposed by HIPAA and the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and District of Columbia Subclass Members' Personal Information; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff

and District of Columbia Subclass Members' Personal Information, including duties imposed by HIPAA and the FTC Act, 15 U.S.C. § 45.

207.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Personal Information.

208.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and District of Columbia Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

209.    Defendants acted intentionally, knowingly, and maliciously to violate the District of Columbia's Consumer Protection Procedures Act, and recklessly disregarded Plaintiff and District of Columbia Subclass Members' rights. Past data breaches within the insurance and health industry put them on notice that its security and privacy protections were inadequate.

210.    As a direct and proximate result of Defendants' unfair, unlawful, and deceptive trade practices, Plaintiff and District of Columbia Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendants as they would not have paid Defendants for goods and services or would have paid less for such goods and services but for Defendants' violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their Personal Information; and an increased, imminent risk of fraud and identity theft.

211.     Plaintiff and District of Columbia Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, restitution, injunctive relief, punitive damages, attorneys' fees and costs, the greater of treble damages or $1500 per violation, and any other relief that the Court deems proper.

## REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of members of the Class and Subclasses, as applicable, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

1.     That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declare that Plaintiffs are proper class representatives, and appoint Plaintiffs' counsel as Class Counsel;

2.     That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

3.     That the Court award Plaintiffs and Class and Subclass Members compensatory, consequential, and general damages, including nominal damages, as allowed by law in an amount to be determined at trial;

4.     That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

5.     That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

6.     That Plaintiffs be granted the declaratory relief sought herein;

7.     That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

8.     That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

Dated: August 9, 2019

Respectfully submitted,

*/s/ Steven T. Webster*
Steven T. Webster (VSB No. 31975)
**WEBSTER BOOK LLP**
300 N. Washington Street
Alexandria, Virginia 22314
Telephone: (888) 987-9991
swebster@websterbook.com

Norman E. Siegel (*pro hac vice* to be submitted)
Barrett J. Vahle (*pro hac vice* to be submitted)
Jillian R. Dent (*pro hac vice* to be submitted)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com
vahle@stuevesiegel.com
dent@stuevesiegel.com

Mark Goldman (*pro hac vice* to be submitted)
**GOLDMAN, SCARLATO & PENNY P.C.**
8 Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, Pennsylvania 19428
Telephone: (484) 342-0700
goldman@lawgsp.com

Michael Yarnoff (*pro hac vice* to be submitted)
**KEHOE LAW FIRM, P.C.**
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, Pennsylvania 19102
Telephone: (215) 792-6676
myarnoff@kehoelawfirm.com

*Counsel for Plaintiffs and the Proposed Classes*